Case No. 25-10886

# United States Court of Appeals
# For the Fifth Circuit

---

Chasity Congious, by and through her Guardian, Kimberly Hammond, on behalf of herself and as Mother and Next Friend of Z.C.H. Deceased,
*Plaintiff – Appellant,*

v.

Aaron Ivy Shaw, DO,
*Defendant – Appellee.*

---

On Appeal from the United States District Court for the
Northern District of Texas, Fort Worth Division
Civil Action No. 4:22-CV-92-O

---

**BRIEF OF APPELLEE AARON IVY SHAW, DO**

---

Derek Carson
State Bar No. 24085240
dcarson@canteyhanger.com
Jordan M. Parker
State Bar No. 15491400
jparker@canteyhanger.com
Tiereney L. Bowman
State Bar No. 24136751
tbowman@canteyhanger.com
**CANTEY HANGER LLP**
600 W. 6th Street, Suite 300
Fort Worth, Texas 76102
Tel. (817) 877-2800

**COUNSEL FOR APPELLEE
AARON IVY SHAW, DO**

## **CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record in *Chasity Congious v. Aaron Ivy Shaw, DO*, No. 25-10886, certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Chasity Congious
Aaron Ivy Shaw, DO
Acclaim Physician Group, Inc.
Tarrant County, Texas
LAW OFFICES OF JARRETT ADAMS, PLLC
COMER LAW GROUP
CANTEY HANGER LLP

/s/ Derek Carson
Derek Carson
Attorney of Record for Appellee

## **STATEMENT REGARDING ORAL ARGUMENT**

Appellee does not believe that oral argument is necessary to resolve the issues raised in this appeal because the facts and legal arguments in the briefs and record are adequately presented. But if the Court is inclined to grant Appellant's request for oral argument, then Appellee wishes to present oral argument as well.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................ii

STATEMENT REGARDING ORAL ARGUMENT .................................iii

TABLE OF CONTENTS ..........................................................................iv

TABLE OF AUTHORITIES.....................................................................vi

JURISDICTIONAL STATEMENT .........................................................ix

STATEMENT OF ISSUES.......................................................................xi

INTRODUCTION......................................................................................1

STATEMENT OF THE CASE ..................................................................3

    1.    Dr. Shaw, as Medical Director of the Tarrant County Jail, oversaw the treatment of patients in the female infirmary, including pregnant patients such as Ms. Congious, but he relied on nurses and other providers, including OB/GYN residents, to provide direct care..............................................3

    2.    Ms. Congious's OB/GYN planned to schedule, at her next visit, an induced labor to occur between weeks 39 and 40 of her pregnancy, but Ms. Congious unexpectedly went into labor while she was still in week 37 of her pregnancy.....................................7

    3.    Dr. Shaw was not aware that Ms. Congious was in labor (or seriously at risk of going into labor) on May 17, 2020. ....................................................8

    4.    Relevant Procedural History ...............................11

STANDARD OF REVIEW.................................................................. 12

SUMMARY OF THE ARGUMENT ....................................................... 13

ARGUMENT ..................................................................................... 15

    1.    The district court correctly applied Fifth Circuit
        precedent in concluding that Dr. Shaw did not
        act with deliberate indifference. ............................................ 15

    2.    The district court correctly credited Dr. Shaw's
        testimony that he did not see the daily report
        email until after Ms. Congious had delivered. ...................... 21

    3.    The district court correctly rejected Appellant's
        "mailbox rule" argument. ..................................................... 28

    4.    The district court correctly concluded that Dr.
        Shaw is entitled to qualified immunity. ............................... 32

    5.    The district court correctly concluded that
        Appellant is not entitled to punitive damages. .................... 37

    6.    In the alternative, this Court may affirm the
        district court on the basis that there are at least
        material factual disputes sufficient to justify the
        denial of Appellant's motion for summary
        judgment................................................................................ 37

CONCLUSION ................................................................................. 38

CERTIFICATE OF COMPLIANCE....................................................... 40

CERTIFICATE OF SERVICE............................................................... 40

# TABLE OF AUTHORITIES

## Cases

*Anibowei v. Morgan,*
　　70 F.4th 898 (5th Cir. 2023)............................................................ix

*Brookwood Dev., L.L.C. v. City of Ridgeland, Miss.,*
　　No. 24-60017, 2024 WL 4835244
　　(5th Cir. Nov. 20, 2024)................................................................ 38

*Brown v. Callahan,*
　　623 F.3d 249 (5th Cir. 2010) ........................................................ 32

*Brumfield v. Hollins,*
　　551 F.3d 322 (5th Cir. 2008) ........................................................ 36

*Cadena v. El Paso Cnty.,*
　　946 F.3d 717 (5th Cir. 2020) ........................................................ 19

*Celotex Corp. v. Catrett,*
　　477 U.S. 317 (1986) ...................................................................... 38

*Century Sur. Co. v. Colgate Operating, L.L.C.,*
　　116 F.4th 345 (5th Cir. 2024)........................................................ 12

*Cope v. Cogdill,*
　　3 F.4th 198 (5th Cir. 2021)............................................................ 30

*Davis v. Gentry,*
　　No. 21-40186, 2023 WL 2706905
　　(5th Cir. Mar. 29, 2023)................................................................ 30

*DeWolff, Boberg & Assocs. Inc. v. Pethick,*
　　133 F.4th 448 (5th Cir. 2025)........................................................ 13

*Domino v. Tex. Dep't of Crim. Justice,*
　　239 F.3d 752 (5th Cir. 2001) .............................. 2, 15-20, 27, 30, 36

*Dyer v. Houston,*
    964 F.3d 374 (5th Cir. 2020) ........................ 15, 19-20, 27, 29-30, 35

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ............................................................. 16, 18

*Gezu v. Charter Commc'ns,*
    17 F.4th 547 (5th Cir. 2021)................................................ 28-29, 31

*Gobert v. Caldwell,*
    463 F.3d 339 (5th Cir. 2006) ................................. 3, 15, 17-20, 29-30

*Hare v. City of Corinth, Miss.,*
    74 F.3d 633 (5th Cir. 1996) ...................................................... 19, 30

*Harmon v. City of Arlington, Tex.,*
    478 F. Supp. 3d 561 (N.D. Tex. 2020),
    *aff'd*, 16 F.4th 1159 (5th Cir. 2021)................................................ 37

*Holtzclaw v. DSC Commc'ns Corp.,*
    255 F.3d 254 (5th Cir. 2001) ........................................................ 13

*Indigenous Peoples of Coastal Bend v.*
*United States Army Corps of Eng'rs,*
    132 F.4th 872 (5th Cir. 2025).................................................... 13, 37

*Johnson v. Treen,*
    759 F.2d 1236 (5th Cir. 1985) ...................................................... 17

*Krohn v. Spectrum Gulf Coast, LLC,*
    No. 3:18-CV-2722-S, 2019 WL 4572833
    (N.D. Tex. Sept. 19, 2019) ................................................... 28-29, 31

*Lane v. HomeGoods, Inc.,*
    No. A-20-CV-01031-JRN, 2021 WL 2277345
    (W.D. Tex. May 10, 2021)............................................................ 27

*McCorvey v. Styles*,
    607 F. App'x 375 (5th Cir. 2015) ..................................................... 37

*Melton v. Tchrs. Ins. & Annuity Ass'n of Am.*,
    114 F.3d 557 (5th Cir. 1997) ........................................................... ix

*Nart v. Open Text Corp.*,
    No. A-10-CV-870-LY-AWA, 2013 WL 442009
    (W.D. Tex. Feb. 5, 2013) ................................................................ 28

*Norman v. Ingle*,
    No. 24-20431, 2025 WL 2371174
    (5th Cir. Aug. 15, 2025) ................................................................. 13

*Ovalle v. United Rentals N. Am., Inc.*,
    No. 21-11076, 2022 WL 4009181
    (5th Cir. Sept. 2, 2022) .................................................................. 24

*Seigler v. Wal-Mart Stores Texas, L.L.C.*,
    30 F.4th 472 (5th Cir. 2022) .......................................................... 25

*Shepherd v. Dallas Cnty.*,
    591 F.3d 445 (5th Cir. 2009). ........................................................ 15

*Winzer v. Kaufman Cnty.*,
    916 F.3d 464 (5th Cir. 2019) .......................................................... 25

## Statutes and Rules

Fed. R. Civ. P. 56 ................................................................................... 13

42 U.S.C. § 1983 ................................................................. 11, 14, 29, 32

## JURISDICTIONAL STATEMENT

Appellee Aaron Ivy Shaw, DO ("Dr. Shaw") questions whether the Court has jurisdiction to hear the issues that Appellant Chasity Congious ("Ms. Congious") raises in this appeal.

Generally, "the denial of a summary judgment motion is not an appealable interlocutory order." *Anibowei v. Morgan*, 70 F.4th 898, 905 (5th Cir. 2023). Yet, in her brief, Ms. Congious challenges only the <u>denial</u> of her motion for summary judgment. She does not challenge the district court's order <u>granting</u> Dr. Shaw's cross-motion for summary judgment. *See* Appellant's Br. 1 (Statement of Issues); Appellant's Br. 6-21 (Argument); *Melton v. Tchrs. Ins. & Annuity Ass'n of Am.*, 114 F.3d 557, 561 (5th Cir. 1997) (stating that "isssues not raised or argued in the brief are considered waived").

Logically, Ms. Congious is impliedly challenging the order granting Dr. Shaw's motion for summary judgment insofar as that order effectively denies her the relief she sought in her summary-judgment motion. And presumably Ms. Congious's intent is to challenge the final judgment dismissing her claims—not just the denial of summary judgment on them. But Ms. Congious's appeal, as briefed, raises no

specific, direct challenges to the portion of the order granting Dr. Shaw's summary-judgment motion. For example, Ms. Congious does not argue that there are material factual disputes that precluded granting Dr. Shaw's motion. Instead, the entire focus of Ms. Congious's brief is the district court's denial of her motion for summary judgment.

## STATEMENT OF ISSUES

1.     Does the Court have jurisdiction to hear the issues presented in the Brief of Appellant?

2.     The district court determined that, as a matter of law, Dr. Shaw did not act with deliberate indifference to the serious medical needs of Ms. Congious and therefore did not violate Ms. Congious's Fourteenth Amendment right to medical care.  Given the absence of a constitutional violation, the district court granted Dr. Shaw's motion for summary judgment and denied Ms. Congious's motion. Was the district court correct in concluding that there was no constitutional violation?

3.     The district court alternatively concluded that, as a matter of law, even if the facts established a constitutional violation, the law was not clearly established that Dr. Shaw's conduct was illegal. The district court thus concluded that Dr. Shaw was entitled to qualified immunity. On that basis, too, the district court granted Dr. Shaw's motion for summary judgment and denied Ms. Congious's motion for summary judgment. Was the district court correct in concluding that Dr. Shaw was entitled to qualified immunity?

## **INTRODUCTION**

The facts underlying this lawsuit are undoubtedly tragic. On Sunday morning, May 17, 2020, Ms. Congious gave birth to her baby in her jail cell, and her baby passed away at Cook Children's Medical Center just days later.

As the district court correctly determined, however, the tragedy was not the result of any deliberate indifference on the part of Dr. Shaw. The evidence in the summary-judgment record is clear that Dr. Shaw did not know that Ms. Congious was in labor on that Sunday morning or even that she was seriously at risk of going into labor.

Dr. Shaw, as Medical Director of the entire Tarrant County Jail, including the infirmary, had to rely on the onsite nurses and other providers to monitor and treat patients in the jail. Dr. Shaw issued standing delegation orders to ensure that pregnant patients like Ms. Congious were cared for onsite and that they were timely transported to the hospital for delivery.

Just four days prior to the incident at issue, Ms. Congious had seen obstetrician-gynecologist ("OB-GYN") Melanie Carter, M.D. ("Dr. Carter") for a routine obstetrics appointment in the OB-GYN Clinic at

the jail. Dr. Carter recommended that Ms. Congious have an elective induction of labor at the hospital sometime between 39 and 40 weeks. Dr. Carter indicated that she would check Ms. Congious again and, at that time, schedule the induction.

On the morning of May 17, 2020, Ms. Congious was still in week 37 of her pregnancy—well before the period when Dr. Carter planned to schedule an induced labor. It was a Sunday morning, and Dr. Shaw was not at work. Given the plan and timeline set in place by Dr. Carter, and considering that there was no indication that Ms. Congious would deliver early, there was no reason for Dr. Shaw to be concerned that Ms. Congious might go into labor on May 17.  And indeed he did not believe she faced any such risk.

To prevail on a denial-of-medical-care claim against Dr. Shaw, Ms. Congious must be able to show that Dr. Shaw was deliberately indifferent to her serious medical needs such that he **subjectively believed** that she faced a substantial risk of serious harm and then wantonly disregarded that risk, in violation of the Fourteenth Amendment. Case law clarifies and emphasizes that deliberate indifference is an "extremely high standard," *Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756

(5th Cir. 2001), which requires proof of **egregious intentional conduct**, *see Gobert v. Caldwell*, 463 F.3d 339, 351 (5th Cir. 2006). To negate Dr. Shaw's defense of qualified immunity, moreover, Ms. Congious must prove that Dr. Shaw violated clearly established law. The district court correctly determined that Ms. Congious failed to meet these standards.  This Court should affirm the district court's order granting Dr. Shaw's motion for summary judgment and denying Ms. Congious's motion.

## STATEMENT OF THE CASE

**1. Dr. Shaw, as Medical Director of the Tarrant County Jail, oversaw the treatment of patients in the female infirmary, including pregnant patients such as Ms. Congious, but he relied on nurses and other providers, including OB/GYN residents, to provide direct care.**

At the time of Ms. Congious's incarceration in early 2023, Dr. Shaw was the Medical Director at the Tarrant County Jail ("TCJ").  ROA.1588-1589, at 11:25-12:6. As Medical Director, Dr. Shaw issued delegation orders and relied upon nurses, physician assistants, and other providers to carry out the treatment of inmates in the infirmary at the TCJ. ROA.1605-1606, at 68:8-23; ROA.1595, at 18:4-16. Dr. Shaw was not able to personally treat—or even stay specifically informed about—every

inmate in the infirmary. ROA.1606-1607, at 69:23-70:1; ROA.1661, at 45:1-4.

Ms. Congious was about twenty (20) weeks pregnant at the time she was initially incarcerated at the TCJ. ROA.1547. Because Ms. Congious had a positive pregnancy test, she was referred to be seen in the TCJ's OB/GYN clinic. ROA.1597, at 20:4:7. The OB/GYN clinic was physically located in the TCJ, and it was generally staffed with two fourth year OB/GYN residents (i.e., residents who had graduated from medical school, had become licensed to practice medicine by the Texas Medical Board, and had received a minimum of three full years of specialized post-graduate training in obstetrics and gynecology), as well as one or two nurses. ROA.1629, at 10:4-23; ROA.1643, at 27:3-15. The residents worked under attending physicians at John Peter Smith Hospital. ROA.1632, at 13:1-9.

In addition, given that Ms. Congious had problems communicating and was not eating enough, Ms. Congious was housed within the female infirmary, which was the highest level of care for a pregnant patient at the TCJ. ROA.1633-1634, at 14:13-15:5; ROA.1561. Every day, nurses regularly made rounds and monitored the patients in the infirmary. *See*,

4

*e.g.*, ROA.1601, at 33:7-15; ROA.1645, at 29:21-23. Over the course of four months, Ms. Congious received more than twenty-five (25) visits and interactions from providers, including OB/GYN residents, physician assistants, and MHMR[1] staff.  ROA.1645, at 29:10-14.

To ensure proper care of pregnant patients like Ms. Congious, Dr. Shaw had written a routine "Standing Delegation Order" for "Pregnant Inmates," which was entered into Ms. Congious's chart by a registered nurse on January 26, 2020, and later reviewed and signed by Dr. Shaw. ROA.1542-1545; ROA.1594-1595, at 17:5-18:16.  Dr. Shaw ordered the following:

1. Obtain Urine Pregnancy test and document results PRN no current result documented.

2. Place on Wait List as High Priority, Star 1.

3. Place on pregnancy diet for duration of pregnancy plus one month.

4. Place on bottom bunk for duration of pregnancy plus one month.

5. Prenatal vitamin one PO daily for duration of pregnancy plus one month.

---

[1] "MHMR" refers to My Health My Resources of Tarrant County, a community center staffed by clinical and administrative professionals, including nurses, social workers, therapists and case managers, who provide mental-health services.

6. Obtain and document vital signs.

7. Examine for lower extremity edema.

8. Notify provider on call for BP.140/90, 2+ edema of lower extremities, vaginal bleeding, or proteinuria.

9. Obtain history of substance use that poses a risk for withdrawal.

10. Immediately refer to Resource PRN [as needed] history of substance posing risk for withdrawal.

11. Resource nurse contact provider on call PRN [as needed] inmate history of substance posing risk for withdrawal

12. Immediately place on next OB clinic schedule.

13. Notify JPS OB triage department PRN [as needed] inmate transfer to JPS OB Triage. Do not send to JPS ED unless specifically ordered by provider on call.

14. Immediately transfer to JPS OB Triage PRN [as needed] suspected labor.

15. Transfer to JPS OB Triage PRN [as needed] suspected labor, water breaks, vaginal bleeding, abdominal bleeding, or T>101.

ROA.1544-1545.

Dr. Shaw never directly treated Ms. Congious. ROA.1610, at 73:8-9. As of May 2020, in fact, Dr. Shaw did not provide direct patient care to *any* patients in the female infirmary. ROA.1607, at 70:2-4; ROA.1635, at 16:3-6. During her time at the TCJ, Ms. Congious was directly treated

by OB/GYN residents, nursing staff, and providers, such as physician assistants, who rounded on the female infirmary.[2]  ROA.1610, at 73:10-13.

## 2. Ms. Congious's OB/GYN planned to schedule, at her next visit, an induced labor to occur between weeks 39 and 40 of her pregnancy, but Ms. Congious unexpectedly went into labor while she was still in week 37 of her pregnancy.

On May 13, 2020, while Ms. Congious was 37 weeks, 1 day gestational age, she was seen by her OB/GYN, Dr. Carter, for a routine obstetrics examination. ROA.1549-1553. While Ms. Congious could respond to some extent, Dr. Carter noted that Ms. Congious was largely "unable to express her symptoms and may not recognize when she goes into labor." ROA.1553; ROA.1648, at 32:21-22.

Dr. Carter recommended that Ms. Congious have an elective induction of labor "between 39 and 40 weeks." ROA.1553. Dr. Carter wrote that she would "plan to check cervix and schedule this [induction] at next visit." ROA.1553. As in previous routine examinations by Dr. Carter, the baby was progressing normally and seemed in good health. ROA.1552; ROA.150, at 34:3-8. All of Dr. Carter's notes were entered into

---

[2] As for mental health care, this was separately provided by MHMR—not the JPS providers underneath Dr. Shaw. ROA.1610, at 73:17-22.

Ms. Congious's chart for nurses and other providers to see. ROA.1947, at 49:23-25.

Just four days later, on the morning of May 17, a nurse and a correctional officer noticed a pinkish color on Ms. Congious's blanket and an odor in her cell.  ROA.1556. This occurred around 9:05 a.m. ROA.1556. When the nurse asked Ms. Congious if she was okay, she responded by covering her head with the blanket. ROA.1556. As it turns out, Ms. Congious had gone into labor. ROA.1556. Her baby was transported by ambulance to Cook Children's Medical Center where, tragically, she died days later.  ROA.1556; ROA.1115.

### 3. Dr. Shaw was not aware that Ms. Congious was in labor (or seriously at risk of going into labor) on May 17, 2020.

Dr. Shaw never knew of any facts indicating that Ms. Congious was in labor or even seriously at risk of going into labor on May 17, 2020. ROA.1611, at 74:1-4, 74:16-21.  Dr. Shaw had documented his agreement with the plan of care prescribed by Ms. Congious's OB/GYN providers, including Dr. Carter's order for "eIOL [elective induction of labor] between 39 and 40 weeks as the patient [Ms. Congious] was unable to express her symptoms and may not recognize when she goes into labor." ROA.1553; ROA.1549-1550.

8

As of May 17, 2020, Ms. Congious was still in week 37 of her pregnancy and was planned to have an induction scheduled to occur between weeks 39 and 40. ROA.1611, at 74:12-15. Dr. Shaw did not conclude, at any point prior to learning that Ms. Congious had delivered in her cell, that this was reasonably likely to happen. ROA.1611, at 74:16-21.

Regularly, nursing staff would circulate a daily report to nurses, providers, and correctional staff concerning inmates in the female and male infirmaries in the TCJ.  ROA.1607, at 70:5-11. The body of these emails would contain a subset of patients with more pressing (though not emergent) issues. ROA.1607, at 70:19-21. Attached to the emails would be charts of the full set of inmates in the infirmaries, with notes on each of the patients. ROA.1607, at 70:22-71:3.

The main purpose of the daily report emails was to convey information among the nurses as they changed shifts. ROA.1608, at 71:4-15. Dr. Shaw did not, in his role, regularly open the attachments to these daily report emails and typically only reviewed the body of the emails to see if he needed to sign off on any requests to transport patients from the hospital. ROA.1608-1609, at 71:20-72:2.

On the morning of May 17, 2020, around 7:29 a.m., the daily report email for May 17, 2020 was circulated. ROA.1559. That email went to Dr. Shaw's email inbox. ROA.1559. Ms. Congious was not listed among the patients in the body of the email.  ROA.1559.

In one of the five attachments to that email, Ms. Congious was listed among the numerous other inmates in the 55D female infirmary. ROA.1561. As can be seen from the following screen shot, the entry next to Ms. Congious's name indicates that that she "Took PM ENSRE but Refused Breakfast" and "C/O ABD CRAMPS":



ROA.1561.

Dr. Shaw did not see or read this email or its attachment—or even know the email had been sent—until after Ms. Congius had delivered. ROA.1612-1613, at 75:17-76:2. For context, May 17, 2020 was a Sunday,

10

and Dr. Shaw was not working. ROA.1613, at 76:11-12. There was a physician assistant on duty that morning, by phone before 8:00 a.m. and then on site beginning around 8:00 a.m.   ROA.1613-164, at 76:22-77:2.

Typically, if a situation became urgent, the physician assistant would be the provider to handle the matter with nurses on site and, if warranted, the physician assistant would call Dr. Shaw. ROA.1614, at 77:8-16. Dr. Shaw, as Medical Director, was generally on-call for emergencies 24/7 and was available on the weekend of May 16-17, 2020 to take a call had any personnel on site elected to escalate Ms. Congious's condition to him. ROA.1614, at 77:21-25. But Dr. Shaw did not receive a call on May 16 or 17, 2020 prior to the delivery at issue. ROA.1614, at 77:17-20. Indeed, an email like this was never meant to address emergencies. ROA.1615, at 78:1-4.

### 4. Relevant Procedural History

On July 29, 2024, Ms. Congious filed her Second Amended Complaint, asserting a § 1983 claim against Dr. Shaw for his alleged denial of her right to medical care under the Fourteenth Amendment.[3]

---

[3] There is a relatively lengthy procedural history that predates the filing of Appellant's Second Amended Complaint. An overview of that procedural history was

ROA.1115-1130.   Dr. Shaw filed his Original Answer and asserted the defense of qualified immunity. ROA.1137; ROA.1150.

After discovery, Dr. Shaw filed a motion asking the district court to grant summary judgment on the basis that Appellant could not create a dispute of fact to support her claim for denial of medical care and also on the basis of qualified immunity. ROA.1497-1521. Ms. Congious also filed a motion for summary judgment on the issues of liability and punitive damages. ROA.1243-1255. The district court entered a Memorandum Opinion and Order granting Dr. Shaw's motion for summary judgment and denying Appellant's motion.  ROA.2159-2171. This appeal ensued.

## STANDARD OF REVIEW

"The court reviews district court judgment rendered on cross-motions for summary judgment de novo. On cross-motions for summary judgment, [the Court] review[s] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Century Sur. Co. v. Colgate Operating, L.L.C.*, 116 F.4th 345, 348–49 (5th Cir. 2024) (citations omitted).

---

set out in Dr. Shaw's summary-judgment brief for the benefit of the district court. ROA.1511-1512. But it is not germane to this appeal.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When a defendant is a public official who makes a good-faith assertion of qualified immunity, that alters the usual summary-judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *Norman v. Ingle*, No. 24-20431, 2025 WL 2371174, at *2 (5th Cir. Aug. 15, 2025).

The Court may affirm a summary judgment order "on any ground supported by the record, even if it is different from that relied on by the district court." *Indigenous Peoples of Coastal Bend v. United States Army Corps of Eng'rs*, 132 F.4th 872, 882 (5th Cir. 2025) (quoting *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 258 (5th Cir. 2001)) (internal quotation marks omitted); *see also DeWolff, Boberg & Assocs. Inc. v. Pethick*, 133 F.4th 448, 453 (5th Cir. 2025) (same).

## SUMMARY OF THE ARGUMENT

The district court correctly determined that, as a matter of law, Dr. Shaw did not act with deliberate indifference and did not violate Ms. Congious's Fourteenth Amendment right to medical care. In the days and

13

months leading up to the incident at issue, Dr. Shaw properly relied on the on-site nurses and providers to follow the delegation orders he had set in place and to provide direct care to patients in the infirmary. Dr. Shaw also reasonably followed the plan and timeline put in place by Ms. Congious's OBGYN, Dr. Carter, and did not believe that Ms. Congious faced a substantial risk of serious harm on Sunday morning, May 17, 2020.

With respect to the May 17 daily report email that Ms. Congious bases her claim on, the district court properly credited Dr. Shaw's testimony that he did not see, open, or read the email until after Ms. Congious had delivered. And the district court correctly declined to import the "mailbox rule" from Texas contracts law into this Section 1983 case. That rule, when it applies, charges the recipient with constructive notice—not the actual notice that is required (yet still itself not enough) to establish deliberate indifference under the Fourteenth Amendment. In arguing that the district court departed from Fifth Circuit precedent, Appellant is simply wrong.

The district court also correctly determined that Dr. Shaw was entitled to qualified immunity as a matter of law. Appellant cannot point

to any clearly established law as of May 2020 that made Dr. Shaw's actions illegal. And to the contrary, Dr. Shaw's actions were at all times demonstrably reasonable and lawful under the Fourteenth Amendment.

This Court should affirm the district court's order granting Dr. Shaw's motion for summary judgment and denying Appellant's motion for summary judgment.

## **ARGUMENT**

### **1. The district court correctly applied Fifth Circuit precedent in concluding that Dr. Shaw did not act with deliberate indifference.**

Appellant creates a false dichotomy, which she supposes to exist between the standards articulated in *Domino*, on the one hand, and those articulated in *Dyer* and *Gobert*, on the other. But those cases all discuss and apply the ***same standard*** (i.e., the standard for proving deliberate indifference in the context of a denial-of-medical-care claim).[4] And the district court correctly applied that standard.

---

[4] "Constitutional challenges by pretrial detainees may be brought under two alternative theories: as an attack on a 'condition of confinement' or as an 'episodic act or omission.'" *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009). Appellant's claim against Dr. Shaw is properly characterized as an episodic-act-or-omission claim. *See id.* (contrasting "condition of confinement" cases, which involve allegations of unconstitutional policies, with "episodic act or omission" cases, which "fault[ ] specific jail officials for their acts or omissions").

## ***Domino***

In *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752 (5th Cir. 2001), a panel of this Court addressed the viability of an Eighth Amendment claim stemming from a psychiatrist's failure to predict a prisoner's suicide. It is unclear why Ms. Congious would want to highlight the *Domino* decision. In that case, a panel of this Court emphasized Supreme Court precedent holding that liability for deliberate indifference is appropriate only where "the official ***knows of*** and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, ***and he must also draw the inference***." *Id.* at 755 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) (internal quotation marks omitted). According to *Domino*, an official's "failure to alleviate a significant risk that the official should have perceived, but did not is insufficient to show deliberate indifference." *Id.* (quoting *Farmer*, 511 U.S. at 838) (internal quotation marks omitted).

The *Domino* panel emphasized that "[d]eliberate indifference is an extremely high standard to meet." *Id.* at 756. The panel noted, for

16

example, that "an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference." *Id.* (citing *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). To illustrate what does suffice, the *Domino* panel quoted from an earlier decision of the Fifth Circuit in *Johnson* and explained that establishing deliberate indifference requires proof that "the officials 'refused to treat [the plaintiff], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Id.* (quoting *Johnson*, 759 at 1238). The *Domino* panel, in other words, was elaborating upon and explaining the deliberate-indifference standard—not articulating a different one. The panel proceeded to hold that the defendant was entitled to summary judgment in his favor due to the lack of a constitutional violation and his entitlement to qualified immunity. *See id.*

### *Gobert*

In *Gobert v. Caldwell*, 463 F.3d 339 (5th Cir. 2006), a panel of this Court reviewed a claim by a former inmate alleging that a prison physician's alleged failure to treat the inmate's injured and infected leg

violated his Eighth Amendment right to medical care.  In holding that the physician did not act with deliberate indifference and therefore was entitled to qualified immunity as a matter of law, the panel applied *Domino* and the cases upon which *Domino* relied.

The *Gobert* panel quoted the Supreme Court's decision in *Farmer*— as *Domino* had done—in recognition that prison official acts with deliberate indifference "only if (A) he knows that inmates face a substantial risk of serious bodily harm and (B) he disregards that risk by failing to take reasonable measures to abate it." *Gobert*, 463 F.3d at 346 (quoting *Farmer*, 511 U.S. at 837) (internal quotation marks omitted). The panel then quoted *Domino*—including the very portion Ms. Congious argues should have applied—in explaining that a showing of deliberate indifference requires evidence that the "officials 'refused to treat [the plaintiff], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Id.* (quoting *Domino*, 239 F.3d

at 756). In short, *Gobert* and *Domino* reflect the same standard, and the district court correctly applied both cases.[5]

## *Dyer*

In *Dyer v. Houston*, 964 F.3d 374 (5th Cir. 2020), a panel of this Court reviewed a pretrial detainee's Fourteenth Amendment claim against paramedics for an alleged denial of medical care.[6] The *Dyer* panel cited *Domino* and recognized that "[t]o succeed on a deliberate-indifference claim, plaintiffs must show that (1) the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and (2) the official actually drew that inference." *Id.* (citing *Domino*, 239 F.3d at 755 (internal quotation marks omitted). The *Domino* panel also cited *Gobert* as an example of Fifth Circuit cases recognizing that deliberate indifference cannot be inferred merely from a negligent or grossly negligent response to a substantial risk of serious

---

[5] Appellant appears to criticize the district court's citation to *Gobert* because *Gobert* involved an Eighth Amendment claim brought by an inmate rather than a Fourteenth Amendment by a pretrial detainee. But *Domino*—the case Appellant is claiming should have been applied—was itself an Eighth Amendment case. And in any event, the standard is the same. *See Cadena v. El Paso Cnty.*, 946 F.3d 717, 727 (5th Cir. 2020); *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996).

[6] *Dyer* also involved claims against police officers, which the panel determined should proceed. *See Dyer*, 964 F.3d at 381-83.

harm. *Id*. at 381 (collecting cases). The *Dyer* case, like the *Gobert* case, applied the same standard as the one articulated in *Domino*.

### *The District Court*

The district court correctly applied the deliberate-indifference standard, as articulated and explained in *Domino*, *Gobert*, and *Dyer*, among other cases. Having cited *Domino* at least five times throughout the opinion, the district court certainly cannot be said to have "abandoned" the *Domino* analysis, as Appellant contends. ROA.2166-2168.

Rather, consistent with *Domino* and other Fifth Circuit cases, the district court accurately concluded that Dr. Shaw did not act with deliberate indifference in light of the facts established in the summary-judgment record, which showed that:

- Dr. Shaw wrote standing delegation orders for pregnant patients and reasonably relied upon on-site providers to monitor and provide direct care to Ms. Congious, ROA.1542-1545, ROA.1594-1595, ROA.1605, ROA.1610;

- Dr. Shaw followed the plan and timeline that OB/GYN Dr. Carter implemented, which contemplated that Dr. Carter would see Ms. Congious again and schedule an induced labor between 39 and 40 weeks, ROA.1553. ROA.1549-1550;

- Ms. Congious was only 37 weeks along when she went into labor on Sunday morning, May 17, 2020, an outcome that Dr. Shaw had no

reason to expect and, in fact, did not expect, ROA.1550, ROA.1555-1556, ROA. 1610-1611;

- Dr. Shaw did not see, read, or know about the May 2020 daily report email, let alone draw any inferences from it, until after Ms. Congious's delivery, ROA.1612-1613;

- As of May 17, 2020, Dr. Shaw did not believe that Ms. Congious or her baby faced a substantial risk of serious harm, ROA.1610-1611.

These undisputed facts, along with others in the record, required denial of Ms. Congious's motion for summary judgment and the granting of Dr. Shaw's. The district court got it right.

## 2. The district court correctly credited Dr. Shaw's testimony that he did not see the daily report email until after Ms. Congious had delivered.

Appellant's entire case rests on the May 17, 2020 daily report email, which she claims Dr. Shaw "ignored" as part of a conscious disregard of her serious medical needs. Appellant's Br. 9. The summary judgment record establishes, however, that Dr. Shaw did not see or read the email until after Ms. Congious had delivered.

On this point, Dr. Shaw presented unrebutted evidence demonstrating that the May 17, 2020 daily report email was a type of regular email circulated to nurses, providers, and correctional staff concerning inmates in the female and male infirmaries in the TCJ.

ROA.1607, at 70:5-11. The body of these emails would contain a subset of patients with more pressing (though not emergent) issues. ROA.1607, at 70:19-21. Attached to the emails would be charts of the full set of inmates in the infirmaries, with notes on each of the patients. ROA.1607, at 70:22-71:3.

These daily report emails were not meant to address emergencies. ROA.1615, at 78:1-4. The main purpose of the daily report emails was to convey information among the nurses as they changed shifts. ROA.1608, at 71:4-15. For this reason, Dr. Shaw did not, in his role, regularly open the attachments to these daily report emails and typically only reviewed the body of the emails to see if he needed to sign off on any requests to transport patients from the hospital. ROA.1608-1609, at 71:16-72:14.

Against this factual backdrop, on the morning of May 17, 2020, around 7:29 a.m., the daily report email for May 17, 2020 was circulated. ROA.1559. That email went to Dr. Shaw's email inbox. ROA.1559. Ms. Congious was not listed among the patients in the body of the email. ROA.1559.

In one of the five attachments to that email, Ms. Congious was listed among the numerous other inmates in the 55D female infirmary:

ROA.1561.

Dr. Shaw did not see or open the email—and certainly did not see anything specific to Ms. Congious—until after the delivery. Dr. Shaw testified plainly to this at his deposition:

> Q.    All right. Did you see or read the email dated May 17th, 2020, or even know it had been sent before the baby was discovered at 5:29 a.m.?
>
> A.    No, I did not.
>
> Q.    You said under oath to Mr. Adams that you didn't know when you opened that email. My question is different. Do you know whether you opened it before the baby was discovered in the cell at approximately 9:00 a.m.?
>
> A.    I know for a fact I did not open it before I got a call about the baby being delivered.
>
> Q.    What was the first knowledge that you had that Ms. Congious had expressed any type of -- or that

Ms. Congious had gone into labor and delivered her baby?

A.   I believe it was a call from Mary Elizabeth Owens, the clinical manager of nursing called me, and then I think after that, I was called by the physician assistant.

ROA.1612-1613, at 75:17-76:10.

Invoking the sham-affidavit doctrine, Appellant contends that Dr. Shaw's testimony on this point was contradictory and should not have been credited. But the sham-affidavit doctrine does not apply to Dr. Shaw's testimony.

For starters, "[t]he sham-affidavit doctrine applies when a plaintiff introduces an ***affidavit*** that conflicts with earlier testimony, such as in a deposition." *Ovalle v. United Rentals N. Am., Inc.*, No. 21-11076, 2022 WL 4009181, at *4 (5th Cir. Sept. 2, 2022) (emphasis added) (citation omitted). Here, the testimony at issue was given, not in an after-the-fact affidavit, but at a deposition where Appellant's counsel was given a chance to cross-examine Dr. Shaw about the testimony. *See id.* ("We have not discovered caselaw applying the sham-affidavit concept to an internal inconsistency within a single deposition testimony."). Even assuming for the sake of argument that Dr. Shaw's testimony was internally

inconsistent, this would simply present an issue of credibility for the fact finder to resolve—it would not preclude the testimony from qualifying as evidence. *See id.* ("Generally, inconsistency within the same testimony would be an issue of credibility for the trier of fact.") (citation omitted).

With that said, even if the sham-affidavit doctrine could be applied to deposition testimony, Dr. Shaw's testimony would not be affected by it. The "bar for applying the doctrine is a high one," and an affidavit that merely "supplements rather than contradicts prior deposition testimony falls outside the doctrine's ambit." *Seigler v. Wal-Mart Stores Texas, L.L.C.*, 30 F.4th 472, 477 (5th Cir. 2022) (citations and internal quotation marks omitted); *see also Winzer v. Kaufman Cnty.*, 916 F.3d 464, 472-73 (5th Cir. 2019) (noting that a district court "cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier statement").

"[T]he sham-affidavit doctrine is not applicable when discrepancies between an affidavit and other testimony can be reconciled such that the statements are not inherently inconsistent." *Seigler*, 30 F.4th at 477 (citing *Winzer*, 916 F.3d at 472-73). Here, Dr. Shaw's testimony that he did not see or read the daily report email until after Ms. Congious had

delivered is not "inherently inconsistent" with any of his prior testimony, and any so-called "inconsistencies" can easily be reconciled.

Earlier in his deposition, Appellant's counsel had asked Dr. Shaw: "when did you open up this email?"  ROA.1314, at 56:15. And Dr. Shaw replied "I don't know when I opened it up."  ROA.1314, at 56:16. Later in the deposition, Dr. Shaw's counsel asked Dr. Shaw to clarify whether he had opened the email before the event at issue (which is a different question than what Appellant's counsel had asked), and Dr. Shaw answered that he knew he did not read the email before then.  ROA.1612-1613, at 75:21-76:2. Appellant's counsel then had an opportunity to cross-examine Dr. Shaw and ask follow-up questions on that subject, but nothing about Dr. Shaw's testimony changed.  ROA.1336-1339.

In short, Dr. Shaw coherently testified that while he does not recall precisely when he opened the email, he knows it was sometime after the event in question. The district court properly credited this testimony.

Appellant also contends that Dr. Shaw's testimony should not be credited because, earlier in his deposition, Appellant's counsel asked Dr. Shaw the broad and open-ended question: "do you recall specifics about Chasity and her care while in the Tarrant County Jail?"  ROA.1277, at

19:5-8. Dr. Shaw replied "I don't recall anything specifically, no." ROA.1277, at 19:9. But there is nothing contradictory about that response. Appellant's counsel's question was not asking about the May 17 email. Although the intent of the question is not entirely clear, it appears to have called upon Dr. Shaw to point out anything that he remembers and regards as noteworthy about the care that Ms. Congious received. Dr. Shaw's reply that he did not recall anything specific about the care provided to Ms. Congious is consistent with the reality that he was the Medical Director of the entire TCJ and that he relied upon other providers to provide direct care to patients in the female infirmary. The sham-affidavit doctrine simply does not apply here, and the district court correctly credited Dr. Shaw's testimony that he did not see or read the daily report email prior Ms. Congious's delivery.[7]

---

[7] Appellant also appears to fault the district court for crediting Dr. Shaw's testimony (that he did not see the May 17 email prior to delivery) because Dr. Shaw stated that he lacks "proof"—beyond his own testimony—that he did not open and read the email. In so arguing, Appellant effectively suggests that it is incumbent on Dr. Shaw to produce additional evidence (beyond his sworn testimony at his deposition) that he did not see or read the email prior to Ms. Congious' delivery on the morning of May 17, 202. But Appellant had the burden to prove that Dr. Shaw was subjectively "aware of facts" indicating that Ms. Congious was in labor or facing serious harm. *Dyer*, 964 F.3d at 380 (quoting *Domino*, 239 F.3d at 756). Dr. Shaw did "not have to prove a negative." *Lane v. HomeGoods, Inc.*, No. A-20-CV-01031-JRN, 2021 WL 2277345, at *3 (W.D. Tex. May 10, 2021).

### 3. The district court correctly rejected Appellant's "mailbox rule" argument.

Appellant makes the novel argument, based on cases applying Texas contract law, that Dr. Shaw is presumed to have known about the contents of the May 17, 2020 daily report email and that Dr. Shaw has the burden to rebut this presumption. There are several problems with this argument.

As preliminary matter, Dr. Shaw does not dispute that the May 17, 2020 daily report email reached his email inbox. In that sense, it is undisputed that Dr. Shaw "received" the email. This unremarkable fact is the most that these cases stand for. *See Gezu v. Charter Commc'ns*, 17 F.4th 547, 554 (5th Cir. 2021) (applying the mailbox rule and finding "a presumption of receipt" of an email); *Krohn v. Spectrum Gulf Coast, LLC*, No. 3:18-CV-2722-S, 2019 WL 4572833, at *3 (N.D. Tex. Sept. 19, 2019) (applying the mailbox rule to find "a presumption of receipt of the Email"); *Nart v. Open Text Corp.*, No. A-10-CV-870-LY-AWA, 2013 WL 442009, at *2 (W.D. Tex. Feb. 5, 2013) (stating that "when emails are sent and do not bounce back, they are presumed to be sent to valid email addresses and to reach the owner of the email address").

Importantly, though, these cases address issues of constructive notice under Texas law, which are not relevant in the Section 1983 context. For example, the *Gezu* and *Krohn* cases each involved a motion to compel arbitration based on an agreement that the employer had allegedly emailed to employees with an explanation that it would be binding on any employee who did not opt-out. *See Gezu*, 17 F.4th at 553; *Krohn*, 2019 WL 4572833, at *3. The issue was whether the employees had fair notice of the arbitration agreement and thus could be compelled to arbitration for failing to timely opt out. *See Gezu*, 17 F.4th at 553-54; *Krohn*, 2019 WL 4572833, at *3.

That is far cry from what is required under the deliberate-indifference standard of the Fourteenth Amendment, which requires proof that Dr. Shaw actually knew and became subjectively aware of the contents of the May 17, 2020 email—and did so *sufficiently in advance* of Ms. Congious's delivery on May 17, 2020, to support an inference that he ignored the email's contents. *See Dyer*, 964 F.3d at 380; *Gobert*, 463 F.3d at 346.

None of the "presumption of notice" cases were decided in the Section 1983 context, and they are inconsistent with the well-established

rule that "[d]eliberate indifference is an extremely high standard to meet" requiring a plaintiff to "show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (citations and internal quotation marks omitted). "[M]edical indifference claims turn on officials' subjective knowledge of the risk of harm posed by their conduct." *Davis v. Gentry*, No. 21-40186, 2023 WL 2706905, at *4 (5th Cir. Mar. 29, 2023) (citing *Gobert*, 463 F.3d at 346). The facts must show "egregious intentional conduct" required to satisfy the exacting deliberate indifference standard." *Gobert*, 463 F.3d at 351.[8] Establishing constructive notice for purposes of a contract or an opt-out form does not support a deliberate-indifference claim. To put it in Appellant's own words, "the 'mailbox rule' has nothing to do with qualified immunity." Appellant's Br. 15.

---

[8] As for the subjective standard, the Fifth Circuit has departed from older precedent requiring proof of "subjective intent" to harm. *See Cope v. Cogdill*, 3 F.4th 198, 208 n.7 (5th Cir. 2021) (citing *Dyer*, 964 F.3d at 380). But the Fifth Circuit still requires proof of "subjective knowledge." *Id*. (citing *Hare*, 74 F.3d at 643).

Lastly, even insofar as the "presumption of notice" cases might otherwise have any application, there are factual differences between those cases and the instant one that make them distinguishable. In *Krohn*, for example, the purported recipient of the email argued that he did "not recall receiving or having read the email," *Krohn*, 2019 WL 4572833, at *3, which is materially different from Dr. Shaw's unequivocal and unrebutted testimony that he knows "for a fact" that he did not read or open the May 17, 2020 email before Ms. Congious gave birth. *See* ROA.1613, at 76:1-2. Furthermore, in *Gezu*, there was evidence that the purported recipient *opened* the email, which is not present here. *See Gezu*, 17 F.4th at 554.

Appellant argues that not applying a presumption of notice would "lead to absurd results" and "could result in a surge of litigation" because a defendant can simply claim to have not read the email, thereby making impossible to prove notice via email. Appellant's Br. 18-19. But, in actuality, absurd results would occur if state officials were deemed to have subjective knowledge of the contents every email in their inbox, the moment the email arrived in the inbox, as advocated by Appellant. A plaintiff could simply send an email to a state official and then establish

deliberate indifference by presumption, regardless of whether the official actually knew about the contents of the email.

The May 17, 2020 daily report email at issue in this case illustrates just how incompatible with Section 1983 Appellant's proposal is. That email was sent early on a Sunday morning and had five attachments. ROA.1613, at 76:11-12; ROA.1559-1578. Appellant is claiming here that Dr. Shaw is legally presumed to have known about a note contained on a single line within one of the five attachments, the moment it arrived in his inbox. This is not what the deliberate-indifference standard envisions.

**4. The district court correctly concluded that Dr. Shaw is entitled to qualified immunity.**

Even assuming for the sake of argument that Appellant could establish a Fourteenth Amendment violation, Dr. Shaw's "actions were objectively reasonable in light of law which was clearly established at the time of the disputed action" and therefore he is entitled to qualified immunity. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (internal quotation marks and citations omitted).

Dr. Shaw wrote standing delegation orders for the care of all pregnant inmates, which included directives concerning when to transfer a patient to the hospital:

> 14.    Immediately transfer to JPS OB Triage PRN suspected labor
>
> 15.    Transfer to JPS OB Triage PRN suspected labor, water breaks, vaginal bleeding, abdominal bleeding, or T>101.

ROA.1545. And he relied on nurses and other on-site medical personnel to monitor the patients in the female infirmary, follow the standard delegation orders, and call him if something arose that warranted doing so. ROA.1605, at 68:9-69:22.

On May 17, 2020, Ms. Congious was a little more than 37 weeks pregnant. She had seen an OBGYN just four days before, who wrote that Ms. Congious should have an elective induction of labor "between 39 and 40 weeks" and noted that she would "plan to check cervix and schedule [the induction] at next visit." ROA.1553. Dr. Shaw had documented his agreement with this plan and had no reason to induce labor prior to the planned timeline. ROA.1553; ROA.1549-1550. Dr. Shaw acted reasonably as a matter of law.

At her deposition, Dr. Carter testified that, as of May 17, 2020, she was not aware of any facts indicating that Ms. Congious was seriously at

33

risk of going into labor on that day, or any day before then. ROA.1661, at 45:22-25. Dr. Carter also testified that she would have been surprised if Dr. Shaw had intervened and asked her to deliver the baby early. ROA.1655, at 39:4-7. No attending physician at JPS has ever done that to her. ROA.1655, at 39:8-12. Indeed, Dr. Carter testified that there are contraindications[9] to delivering a baby at 37 weeks when there is no medical reason. ROA.1654, at 38:7-16. A communication deficit is not a medical reason that justifies inducing labor at 37 weeks. ROA.1654, at 38:7-23.

Furthermore, Dr. Shaw did not see or know about the contents of the daily report email sent out on Sunday, May 17, 2020, until after the delivery, and likewise did not receive an advance phone call alerting him about any exigencies involving Ms. Congious. ROA.1612-1613, at 75:17-76:10, 77:17-20.

According to Dr. David M. Mathis, M.D., F.A.A.F.P., C.C.H.P.-C.P., whom Dr. Shaw retained as an expert on correctional medical care, it is

---

[9] "A contraindication is a specific situation in which a medicine, procedure, or surgery should not be used because it may be harmful to the person." MedlinePlus, National Library of Medicine (Nat'l Inst. of Health), *available at* https://medlineplus.gov/ency/article/002314.htm#:~:text=A%20contraindication%20is%20a%20specific,or%20procedures%20are%20used%20together (last visited Nov. 10, 2025).

unreasonable to expect that a medical director of a correctional facility like the TCJ would see and respond in emergent fashion to an email like the one referenced above. ROA.1531, at ¶10. In Dr. Mathis's opinion, the standard of care for dealing with possible emergencies is for the on-site clinical providers to assess and care for patients with suspected labor, such as an R.N., an on-site medical provider, or an on-call medical provider. ROA.1530-1531, at ¶¶ 9, 11. This allocation of duties is what Dr. Shaw facilitated by virtue of his standing delegation orders. ROA.1531, at ¶¶ 12-13. Dr. Mathis opines that Dr. Shaw did not have a clinical relationship with Ms. Congious and that he did not deviate from the accepted and appropriate standard of conduct as the Medical Director with respect to Ms. Congious or her baby. ROA.1531, at ¶¶ 14-16.

In short, Dr. Shaw met the standard of care applicable to a Medical Director under the circumstances. With that said, he did not have to. It is enough that this involved an exercise in medical judgment at all. *See Dyer*, 964 F.3d at 381 (noting that deliberate indifference cannot be met by showing even "a grossly negligent response to a substantial risk of serious harm" and that "the decision whether to provide additional treatment is a classic example of a matter for medical judgment,' which

fails to give rise to a deliberate-indifference claim"); *Domino*, 239 F.3d at 756 ("It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference."). Dr. Shaw exercised his medical judgment in issuing the standing delegation orders and accepting Dr. Carter's recommendation of an induced labor between weeks 39 and 40 of pregnancy. He likewise exercised his judgment in carrying out his administrative duties, such as staffing on weekends.

Although the "plaintiff has the burden to negate the defense once properly raised," Appellant did not produce evidence sufficient to "rebut this defense." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citation omitted). As the district court observed, Appellant "does not even attempt to identify a case with similar facts that put [Dr. Shaw] on notice." ROA.2169. The district court correctly determined that Dr. Shaw was entitled to qualified immunity because "the law was not clearly established that Defendant's conduct, namely, failure to check his email, was illegal." ROA.2170.

**5. The district court correctly concluded that Appellant is not entitled to punitive damages.**

Given that Appellant cannot prevail as to liability, her request for summary judgment awarding her punitive damages likewise fails. *See Harmon v. City of Arlington, Texas*, 478 F. Supp. 3d 561, 578 (N.D. Tex. 2020), *aff'd*, 16 F.4th 1159 (5th Cir. 2021) (recognizing that claim for punitive damages fails when the defendant is entitled to qualified immunity and when the plaintiff has failed to establish an underlying violation of her constitutional rights). The Court should affirm the district court's denial of Appellant's motion for summary judgment on punitive damages.

**6. In the alternative, this Court may affirm the district court on the basis that there are at least material factual disputes sufficient to justify the denial of Appellant's motion for summary judgment.**

The Court "may affirm the grant or denial of summary judgment on any basis supported by the record." *McCorvey v. Styles*, 607 F. App'x 375, 376–77 (5th Cir. 2015). This is true "even if [the basis] is different from that relied on by the district court." *Indigenous Peoples of Coastal Bend*, 132 F.4th at 882 (citation omitted).

To justify the denial of summary judgment to Appellant, the record need only reflect "specific facts that demonstrate a genuine issue for trial."[10] *Brookwood Dev., L.L.C. v. City of Ridgeland, Mississippi*, No. 24-60017, 2024 WL 4835244, at *2 (5th Cir. Nov. 20, 2024) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). There is more than enough evidence in the record to establish that, at a minimum, there is a material factual dispute that Dr. Shaw did not act with deliberate indifference and was entitled to qualified immunity.

## **CONCLUSION**

For these reasons, the Court should affirm the district court's July 1, 2025 *Memorandum Opinion & Order* and corresponding final judgment in their entirety. ROA.2159-2172.

---

[10] As Dr. Shaw flagged in his Jurisdictional Statement, Ms. Congious challenges only the district court's <u>denial</u> of her summary-judgment motion. She does not directly challenge the district court's order <u>granting</u> Dr. Shaw's motion for summary judgment. Impliedly, of course, Ms. Congious is challenging that order insofar as it is inconsistent with granting her motion for summary judgment. But she has not raised any specific, direct challenge to the aspect of the district court's order granting Dr. Shaw's summary-judgment motion. She is not arguing, for example, there were disputes of material fact that made the granting of Dr. Shaw's motion erroneous.

Respectfully submitted,

/s/ Derek Carson
Derek Carson
State Bar No. 24085240
dcarson@canteyhanger.com
Jordan M. Parker
State Bar No. 15491400
jparker@canteyhanger.com
Tiereney L. Bowman
State Bar No. 24136751
tbowman@canteyhanger.com

**CANTEY HANGER LLP**
Cantey Hanger Plaza
600 W. 6th Street, Suite 300
Fort Worth, Texas 76102
Tel. (817) 877-2800

**ATTORNEYS FOR APPELLEE**
**AARON IVY SHAW, DO**

## **CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume/word limit of Federal Rule of Appellate Procedure 32(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), this document contains 8,036 words (i.e., less than 13,000 words).  This word count was arrived at using the word-count feature of Microsoft Word.

/s/ Derek Carson
Derek Carson

## **CERTIFICATE OF SERVICE**

On November 12, 2025, a copy of the aforementioned document was served on counsel of record via this Court's ECF system.

/s/ Derek Carson
Derek Carson

40